ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Phoenix Management, Inc. ) | ASBCA No. 59273 |
| ) | |
| Under Contract No. FA6648-12-C-0019 ) | |

APPEARANCES FOR THE APPELLANT:      Johnathan M. Bailey, Esq.
                                    Kristin E. Zachman, Esq.
                                     Bailey & Bailey, P.C.
                                     San Antonio, TX

APPEARANCES FOR THE GOVERNMENT:     Lt Col James H. Kennedy III, USAF
                                     Air Force Chief Trial Attorney
                                    Capt Amy K. Siak, USAF
                                    Carrie W. Fogle, Esq.
                                    Sarah L. Stanton, Esq.
                                     Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE FREEMAN ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

This appeal arises under an Air Force base operations contract (hereinafter Contract 0019). The contractor, Phoenix Management, Inc. (PMI), appeals a contracting officer's final decision denying its claims for declaratory relief and equitable price adjustment for the government's failure to disclose superior knowledge and defective estimate of the workload requirements. The government moves for summary judgment on the grounds that PMI has not shown any loss from the alleged failure to disclose or the alleged defective estimate. We find genuine issues of material fact in dispute and deny the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. Contract 0019 was solicited on 10 November 2011 and awarded to PMI on 26 September 2012. The contract required PMI to provide specified operating services at Homestead Air Reserve Base, Florida, for an initial ten-month period from 1 November 2012 to 31 August 2013 with four consecutive one-year options exercisable by the government for continued performance thereafter. (R4, tab 1 at 1, 4, 19, 27-28, 35, 43)

2. Contract line item number (CLIN) 0006, entitled "Operation of Real Property Maintenance (RPM)," was a firm-fixed-price CLIN in the amount of $39,241 per month for the ten months of the initial term of the contract (R4, tab 1 at 6). Tab F of the Contract 0019 Performance Work Statement (PWS) specified the RPM work (R4, tab 21 at 1, 5). Section F5.18 of tab F specified the work to be performed on the base fire detection, protection and suppression systems (hereinafter "the fire systems") as follows:

> **F5.18 Fire Detection, Protection, and Suppression Systems:** The SP [Service Provider] shall maintain, inspect, and test all fire detection/integrated mass notification and fire suppression system, controllers, pumps, engines, and water supply tanks IAW UFC 3-601-02, UFC 4-021-01 and where applicable NFPA 72. (See F-TE-2h for quantities and locations).
>
> **F5.18.1** The SP shall repair all defects or malfunctions as an emergency or urgent service call under the Labor for Service Call CLIN of the contract.
>
> **F5.18.2** The SP shall perform all RWP [recurring work program] maintenance, inspections, tests, and repairs using NICET certified individuals, certified in the appropriate classification and proficient on fire detection, protection, and suppression systems. Technicians must be supervised by a state certified fire inspector or NICET certified technician. All RWP maintenance, inspections, tests, and repairs shall be coordinated with the Fire Department. Submit a written report of all inspection and test findings to the Fire Department and BCE within five workdays after monthly inspections in accordance with F-TE-3, F48.

(R4, tab 21 at 130)

3. Pursuant to section F5.18.1 of the PWS, the labor for repair of defects and malfunctions of the fire systems was not performed under the inspection, test and maintenance (ITM) fixed-price CLIN 0006, but under the Labor for Service Call CLINs at specified hourly labor rates. The direct parts and materials for the repairs were compensated under cost-reimbursement CLINs. (R4, tab 1 at 9, 12) The contract also allowed PMI to subcontract the service call repair work under section H – Special Contract Requirements as follows:

2

## H-5 AFRC SERVICE CALL SUBCONTRACTS

> In the event a subcontract is contemplated for which Labor Categories are established under the Service Call CLIN, the contractor shall prepare a 'make or buy' analysis with prime (make) versus subcontract (buy) pricing. The prime (make) estimate shall be developed in the Inter[i]m Work Information Management System (IWIMS). The total allowable price shall be the lesser of the price to subcontract the work or the price of the IWIMS estimate utilizing the applicable labor rates.

(R4, tab 1 at 62)

4. PWS Technical Exhibit F-TE-2, "WORKLOAD ESTIMATES," specified the number, type and location of the various fire systems on the base. This workload consisted of about 79 building fire detection and alarm systems, 62 base-wide fire hydrants and yard monitors, 5 diesel fire pumps, 5 water supply tanks, and 49 building fire suppression systems of various types (36 wet, 4 foam/wet, 1 wet & pump, 2 pumps, 2 foam/wet/pump, 1 standpipe, 1 $CO_2$, and 2 Halon). (R4, tab 21 at 143, 160-63) The frequency, components, and tasks for the ITM of each of these fire systems was specified in detail in UFC 3-601-02 at pages 11-14, 25-37, 40-44.[1] PWS Technical Exhibit F-TE-2b provided a service call workload estimate of 2 emergency and 44 urgent service calls over a 12-month period for the entire Real Property Maintenance CLIN 0006, of which the fire systems were a part (R4, tab 21 at 143).

5. PMI contends that the government failed to advise bidders that "most" of the fire detection/suppression systems were "proprietary systems which can only be serviced by firms that are authorized and licensed by the OEM" (app. resp. at 3). The government contends that: "It is known throughout the industry that any fire system contains proprietary components/information/software." The government further contends that "[t]he fire systems at Homestead ARB are manufactured by Digitize and the only proprietary portion of the system is the wireless notification portion of the alarm system." (R4, tab 50 at 2)

6. From 31 August to 10 October 2012, the fire suppression systems in 37 of the 49 buildings listed in the PWS as having those systems were inspected by another previous contractor. The suppression systems in 20 of the buildings passed the inspection. The suppression systems in 17 of the buildings had 1 or more failures. (R4, tab 21 at 162-63; app. supp. R4, tab 6 at 54-56)

---

[1] Compliance with the UFC 3-601-02 is specified in the PWS (*see* SOF ¶ 2) and we admit the entire document dated 8 September 2010 in evidence as Bd. ex. 1.

7. PMI alleges that on 28 November 2012 it "found out that the Unified Facilities Criteria (UFC 3-601-01) [sic] is the official document used for Fire Protection and Suppression Systems at Homestead ARB" and that "no inspections were ever done on the Fire Alarm Systems in the past 5 years, and the inspections on the Suppression System were started only in Aug. 2012" (R4, tab 49 at 12-13).

8. On 19 February 2013, PMI submitted a request for "Contract Modification or Equitable Adjustment…regarding the Fire Detection/Suppression System inspection, certification and maintenance backlog…so that [for] these systems, all required inspections, testing/certifications and repairs may be brought up to industry standards under the UFC and NFPA, as applicable" (app. supp. R4, tab 4 at 1). On the present record, there is no evidence of any response by the contracting officer to this request.

9. The UFC 3-601-02, Table 2-1 entitled "Fire Detection and Alarm System ITM Tasks," shows 18 tasks to be performed cumulatively over a 5-year period. There is 1 monthly task, 10 annual tasks, 6 bi-annual tasks and one 5-year task. (Bd. ex. 1) Thus, if as PMI alleges, and the government does not deny, that there had been no fire alarm tests in the past 5 years, PMI would have to perform in the initial 10-month term of the contract not only the required monthly tasks, but also in each of the 79 buildings having fire alarm systems, the other 17 tasks in the 5-year program to bring the alarm systems into compliance with UFC 3-601-02.[2]

10. On 24 February 2014, PMI submitted a claim under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. The claim alleged that, (i) prior to the contract, the government had not properly maintained the fire systems to the industry standards, (ii) the solicitation did not disclose the government's estimated $300,000 of urgently needed inspections and repairs of the systems, (iii) the government's estimate of the number of emergency and urgent service calls in the PWS did not "reflect the volume of work it actually knew would be required," and (iv) the government failed to advise offerors (other than the incumbent) that "most of the fire detection/suppression systems are proprietary systems which can only be serviced by firms that are authorized and licensed by the OEM"[3] (R4, tab 49 at 2-4). PMI's claim concluded with the following demand for relief:

---

[2] Table 2-1 for the alarm systems is only the first of the ITM task schedules in UFC 3-601-02. There are 15 other schedules similarly structured as to frequency, component, and tasks for each of the fire suppression system types commonly in use. (*See* SOF ¶ 4)

[3] PMI's concern about the fire systems being proprietary was that if it had to subcontract the work on the proprietary systems to the firms authorized by the

4

1) Declaratory relief finding that PMI is not responsible under its firm, fixed price for the cost of inspection, certification and any and all repairs of any fire detection, suppression and notification systems, but that any and all such work is to be performed by subcontractors under work order on a cost-reimbursement basis; and

2) Declaratory relief finding that under Paragraph H-5 where work is required on a proprietary system such that it is impossible for PMI to perform such work with its own efforts, the amount of approved work orders shall be the amount actually charged by qualified vendors under competitive quotations in a make or buy analysis, and not limited to the rates in PMI's contract; and

3) An equitable adjustment to the contract price to make PMI whole for the increased costs of performing inspections, certifications and associated repairs where work orders have not been approved by the Government. At present that amount stands at $2,678.00. This is a continuing claim, and the amount claimed will be increased by future work for which the Government does not approve payment as requested by PMI.

(R4, tab 49 at 33-34)

11. PMI's specific monetary claim of $2,678.00 was for "the semi-annual halon system inspection and certification at [B]uilding 4055, for which the Government has refused to issue a work order" (R4, tab 49 at 2). However, in its response to the government's motion for summary judgment, PMI states that "on July 2, 2013 the Government approved payment for Halon Inspection at Building 4055 in the amount of $2,600.00 by Advanced Systems, Inc. as a certified subcontractor to PMI." PMI also states that the government has "approved a further work order in the amount of $21,300.00 for payment to Advanced Systems, Inc. to make repairs to Building 4055 that were shown to be necessary during that inspection due to the long neglect of those systems." (App. resp. at 25-26)

---

OEM, the government under paragraph H-5 of the contract "would only pay for work…at the labor rates provided for PMI's own efforts" (R4, tab 49 at 4).

12. On 24 April 2014, the contracting officer issued a final decision denying the claim entirely. The final decision answered the three requests for relief as follows:

> PMI is requesting relief finding that it is not required to perform the inspections and preventative maintenance and any and all repairs of the fire systems at Homestead ARB under the FFP CLIN 0006 contained in [Contract 0019]. PMI has never been obligated under the FFP CLIN to provide repairs under the FFP CLIN.... PMI is and will continue to be required to provide the inspection and preventative maintenance on the fire systems at Homestead ARB IAW the terms and conditions of the contract. If PMI makes the corporate decision to subcontract the inspections to a subcontractor that is its business decision but no increase in the FFP will be allowed.
>
> a. Additionally, PMI is requesting relief from Provision H-5 of the contract. As stated numerous times above, the entirety of the fire systems are not proprietary; therefore, it would be inappropriate to provide PMI with a blank check regarding repairs of the fire systems at Homestead ARB. By requiring PMI to submit an analysis of costs it will enable the Government to receive the best value for the funds expended in the repair of the fire systems. To date PMI has not hired the Fire Alarm Systems Mechanic that it proposed so it would be impossible for PMI to provide the repairs in house. PMI was awarded the Homestead ARB BOS contract in part because its proposal was found to be technically acceptable based upon the requirements in the RFP. A portion of that evaluation was how they proposed to maintain, inspect and test all fire detection/integrated mass notification and fire suppression systems. PMI's proposal specifically demonstrated that they would have both a Fire Alarm Systems Mechanic and Plumber on staff to perform this requirement.
>
> b. Finally, PMI is seeking an equitable adjustment in the amount of $2,678.00. PMI has not submitted any justification for this amount other than it is for a work order denied by the Government. PMI did not specify if the work order was for inspection and maintenance, or repair. If the claim is for inspection and maintenance then

6

the amount is a portion of the FFP under CLIN 0006 of the contract. If the amount claimed is for repair, PMI has not provided any information as to if the repair was to a proprietary portion of the system or to another potion of the system. Additionally, IAW the terms and conditions of the contract PMI is not authorized to perform any service calls over $500 without the approval of the BCE. If the amount claimed was in fact for a repair PMI has violated the terms and conditions of the contract.

(R4, tab 50 at 7-8)

13. On 24 April 2014, PMI appealed the contracting officer's final decision to this Board. On 4 June 2014, the government moved for summary judgment on the grounds that there was no genuine issue of material fact that (i) the contract required PMI to inspect and maintain all fire systems, (ii) the government made no representation as to how much inspection and maintenance was required, (iii) PMI made no attempt to assess how much might be required prior to submitting its bid, (iv) even if the repair work was many times more than what PMI had assumed, since it is paid for on a cost-reimbursable basis for both labor and materials, PMI is unable to establish that it will suffer any loss, and (v) "as no inspections have taken place, they have no grounds to assert they should be afforded relief" (mot. at 9-10).

14. The PMI "Response" to the motion contends that there are genuine issues of material fact as to, among other things, (i) the government's characterization of the Labor for Service Call CLINs as "cost reimbursable" CLINs, (ii) the reasonableness of PMI's fixed-price bid for CLIN 0006 considering the government's undisclosed knowledge of the poor maintenance condition of the fire systems, and (iii) the extent to which the fire systems were proprietary with servicing limited to firms authorized by the OEM (app. resp. at 26-27).

DECISION

Summary judgment is properly granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). On the record before us on the motion, we find genuine issues of material fact that preclude a grant of summary judgment.

With respect to the fixed-price ITM work under CLIN 0006 of the contract, there is a genuine issue of material fact as to whether the government made any representation as to how much inspection, test and maintenance of the systems would be required. The government states that it did not (mot. at 9). However, in the PWS

7

and in the UFC 3-601-02 specified therein, the government specified the number, type and location of the fire systems to be serviced and the specific ITM tasks and frequency of performing those tasks. There is also a genuine issue of material fact as to whether the cost of performing the fixed-price CLIN 0006 ITM work, which did not include any repair work on any defects or malfunctions in the fire systems, was increased by the fact that the systems previously had not been inspected, tested and maintained to industry standards.

With respect to the labor repair work to be performed under the Labor for Service Call CLINs at contractually agreed hourly rates, the government did not provide an estimate of the service calls specifically for the fire systems, but it did provide an estimate for the entire RPM CLIN 0006 of which the fire systems were a part. That estimate was a total of 2 "emergency" calls and 44 "urgent" calls for the first 12 months of the contract. (*See* SOF ¶ 4 above) There is a genuine issue of material fact as to the number of "emergency" service calls and the number of "urgent" service calls that were actually made in the first 12 months of the contract. There is also a genuine issue of material fact as to how many of these calls were for defects and malfunctions known to the government before the solicitation of PMI's contract and not included in the estimate of emergency and urgent service calls.

The government's contention that PMI is unable to establish that it will suffer any loss on the repair work because it is paid for "on a cost reimbursable basis for both labor and materials" is incorrect (gov't mot. at 10). The material for repairs is reimbursed at cost but the labor is reimbursed based on fixed hourly rates in the contract, and if the contractor cannot make the repair at the contractually agreed hourly labor rates it must bear the loss. There are genuine issues of material fact as to the extent of the proprietary components of the fire systems, and the extent if any to which the hourly labor rates of the firms authorized by the OEM to make repairs exceed the hourly rates specified in PMI's contract.

The foregoing is not an exhaustive list of the genuine issues of material fact in dispute in this appeal but it is sufficient for purposes of the motion.

8

The motion for summary judgment is denied.

Dated: 8 April 2015

MONROE E. FREEMAN, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59273, Appeal of Phoenix Management, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9